# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| ANNA GRIMARD | ) |
| | ) |
| Plaintiff | ) Civil Action No. l:21-cv-00410-SM |
| | )        <u>Jury Trial Requested</u> |
| v. | ) |
| | ) |
| PHYNET DERMATOLOGY LLC, | ) |
| NORTHEAST DERMATOLOGY | ) |
| ASSOCIATES, P.C. | ) |
| | ) |
| Defendants | ) |

**FIRST AMENDED COMPLAINT**
**JURY REQUESTED**

**Table of Contents**

INTRODUCTION.................................................................................................2

I. LEGAL FRAMEWORK.................................................................................3

   A.   Parties .......................................................................................................3

   B.   Jurisdiction and Venue ...........................................................................4

   C.   The Laws Violated ..................................................................................5

      1.   The Federal False Claims Act ...........................................................5

      2.   The State False Claims Acts ..............................................................7

II. THE REGULATORY FRAMEWORK............................................................7

   A.   The Government Health Care Programs ..................................................7

      1.   Medicare............................................................................................7

      2.   Medicaid............................................................................................8

      3.   TRICARE...........................................................................................8

   B.   Requirements for Payment of Claims .....................................................9

III.   THE FRAUDULENT SCHEME ..............................................................13

   A.   How the Billing Process was Supposed to Work...................................13

   B.   How the Billing Process Actually Worked .................................................16

      1.   Services Not Performed ...................................................................16

      2.   Knowledge of Fraudulent Billing (Scienter)..................................22

IV.   MATERIALITY .........................................................................................24

V.   UNLAWFUL RETALIATION .....................................................................27

VI.   COUNTS ....................................................................................................34

   I  Retaliation in Violation of False Claims Act 31 U.S.C. §3730 (h)...............34

   II  Retaliation in Violation of the NH Whistleblower Protection Act
      N.H. Rev. Stat. § 275-E:2……………………………………………...…..35

   III Wrongful Termination, Violation of NH Law……………………………..35

This is a retaliation action brought by the Plaintiff to recover damages arising from the actions of PhyNet Dermatology LLC, and Northeast Dermatology Associates, P.C. ("Defendants").

## INTRODUCTION

1.      Defendants offer dermatology services across the United States, including in New Hampshire, Massachusetts and Maine. As part of their dermatology services, Defendants offer and perform Mohs surgeries. Through Medicare, Medicaid, and TRICARE, the government pays for Mohs surgeries, including all these Mohs-related services.

2.      The government reimburses health care providers for dermatology evaluation and management services or consultations (pre-operative services), and post-operative services performed by a physician or qualified staff supervised by a physician.  The government requires that, when staff are performing these high-risk services to patients, they be supervised by a physician.  The government also pays more money for these services when performed directly by the physician and supervised by qualified staff than it does for the same services performed solely by qualified staff without physician involvement.

3.      Defendants also fraudulently billed the government for these services related to the Mohs surgeries.  First, Defendants billed the government at the higher rate paid to physicians even when the services were performed only by staff.  Second, Defendants did not ensure that staff were supervised when they were performing these high-risk services such as post-operative infection control and wound care.  Third, Defendants' unsupervised staff were unqualified and uncertified.

4.      Ultimately, Defendants retaliated against Plaintiff for raising, objecting to, and opposing fraud on the United States. Defendants demoted Plaintiff and transferred her to a

position at a different location, requiring a longer commute. In light of Plaintiff's demotion and

the change in the place of her employment, Defendants constructively discharged Plaintiff when

she refused the changes to the terms and conditions of her employment.

## I.    LEGAL FRAMEWORK

### A.  Parties

5.    Grimard[1] alleges, based upon personal knowledge, relevant documents, and

information, and on information and belief, the facts set forth in this Complaint.

6.    Grimard has first-hand knowledge of Defendants' policies and practices alleged in

this Complaint as an employee of Defendants at certain New Hampshire and Massachusetts

locations.

7.    Grimard was retaliated against for raising, objecting to, and opposing fraudulent

conduct alleged in this Complaint.

8.    Defendant Northeast Dermatology Associates ("NEDA") is a group of medical

offices that specialize in the dermatology needs of patients, including the diagnosis and

management of skin, hair and nail diseases.

9.    On information and belief, NEDA has about twenty-six office locations in the

states of New Hampshire, Massachusetts and Maine, and operates a central office in Lawrence,

Massachusetts.

10.    NEDA is incorporated in the state of Massachusetts and headquartered in

Lawrence, Massachusetts.

---

[1] Plaintiff Anna Grimard was formerly known as Anna Kozak.  Her legal name has changed since this matter was originally filed.

11.     On information and belief, PhyNet Dermatology LLC ("PhyNet") has owned and operated NEDA since at least 2017 when it initially bought the practice from local management because PhyNet believed NEDA would be a lucrative acquisition.

12.     PhyNet is an outsourced managed services company for dermatology practices, and provides key administrative services for these practices, including billing and collections, payor contracting/negotiation, compliance, finance and accounting, and M&A execution and integration.

13.     PhyNet operates offices nationwide.

14.     PhyNet is incorporated in Delaware and headquartered in Franklin, Tennessee.

15.     On information and belief, PhyNet manages and is responsible for the day-to-day operations of NEDA, including:

• recruiting, employing and paying all NEDA staff, including physicians, and hiring new physicians and staff to service NEDA locations.

• handling final operational, financial and human resource decisions.

• being responsible for NEDA's compliance with federal and state regulations.

16.     PhyNet and NEDA were an integrated enterprise during all times material to this Complaint with common management, common ownership, interrelationship of operations, and centralized control of labor relations.

**B.     Jurisdiction and Venue**

17.     This Court has subject matter jurisdiction over the claims asserted in this Complaint, pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

18.     Venue is proper in this judicial district, pursuant to 31 U.S.C. § 3732(a), because one or more defendants may be found, resides, and/or transacts business in this District, or because an act, proscribed by 31 U.S.C. § 3729, occurred in this District.

19.     Plaintiff seeks and demands a trial by jury for all claims and issues for which a jury is permitted.

**C.     The Laws Violated**

**1.     The Federal False Claims Act**

20.     The False Claims Act provides, in part: Liability for Certain Acts. — (1) In general.—[  ] any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim

(C) conspires to commit a violation of subparagraph (A), (B), [ ] or[ ]

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, [  ]

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.  31 U.S.C. § 3729(a)(1)(A), (B), (C), (G).

21.     Under the False Claims Act, scienter must be demonstrated: Definitions—For purposes of this section— (1) the terms "knowing" and "knowingly"— (A) mean that a person, with respect to information— (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud.  31 U.S.C. § 3729(b)(1)-(2).

22.     Under section (b)(2) the term "claim" —  (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that— (i)  is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government— (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; [  ].  31 U.S.C. § 3729(b)(1)-(2).

23.     Under the False Claims Act, materiality is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4); *Universal Health Services, Inc. v. United States ex rel. Escobar, et al*. 136 S. Ct. 1989 (2016).

24.     The False Claims Act also prohibits employers from unlawfully retaliating against employees who take actions in furtherance of a False Claims Act action including actions which could reasonably lead to a False Claims Act action.

25.     The anti-retaliation provision of the False Claims Act provides that, "[a]ny employee… shall be entitled to all relief necessary to make that employee… whole, if that employee… is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1).

**2.     The State False Claims Acts**

26.     Violations of the federal False Claims Act also, in some circumstances, violate the false claims acts of New Hampshire.

**II.    THE REGULATORY FRAMEWORK**

**A.     The Government Health Care Programs**

**1.     Medicare**

27.     In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.,* to pay the costs of certain health care services for eligible individuals, also known as Medicare.  42 U.S.C. §§ 426, 426a.

28.     The other federal and state healthcare programs have similar requirements and have similarly been defrauded by the Defendants, including Medicaid and Medicare.

29.     The Medicare program consists of four parts: A, B, C and D.  Defendants submitted, or caused to be submitted, false claims under Medicare Part B.

30.     Medicare Part A provides coverage for hospital costs, services rendered by hospitals, skilled nursing facilities, home health care, and hospice care.

31.     Medicare Part B covers the cost of medically necessary services, including provider services, clinical laboratory tests and other medical services and supplies. 42 U.S.C. § § 1395j-1395w-4.

32.     Medicare provides coverage for items and services that are reasonable and necessary to diagnose or treat an illness or injury or to improve a malformed body member. Payment will be provided if medical necessity is documented and can be substantiated.  Section 1862(a)(1) of the Social Security Act, CMS Manual System, Pub. 100-02, Medicare Benefit Policy Manual, Ch. 16, sec. 20.

**2.    Medicaid**

33.     The Medicaid program provides funding for medical and health-related services for certain individuals and families with low incomes and virtually no financial resources. 42 U.S.C. § 1396, *et seq*. Those eligible for Medicaid include pregnant women, children, and persons who are blind or suffer from other disabilities and who cannot afford the cost of health care. 42 U.S.C. § 1396d.

34.     The Medicaid program is a joint federal–state health care program. 42 U.S.C. § 1396b. If a state elects to participate in the program, the costs of Medicaid are shared between the state and the federal government. 42 U.S.C. § 1396a(a)(2). To receive federal funding, a participating state must comply with requirements and regulations imposed by the Act.

**3.    TRICARE**

35.     TRICARE is a federal health care program that is administered by the Defense Health Agency ("DHA"), which is a component of the United States Department of Defense ("DOD"). TRICARE provides health care insurance for active duty military personnel, military retirees, and military dependents.

36.     TRICARE also requires that appropriate medical records be maintained to substantiate that billed services were actually rendered. Failure to document the care billed will result in denial of payment by TRICARE. 32 C.F.R. § 199.7(b)(3).

**B.    Requirements for Payment of Claims**

37.     Medicare providers such as Defendants have a legal duty to familiarize themselves with Medicare's reimbursement rules, including those delineated in the Medicare Manuals. *Heckler v. Cmty. Health Serv. of Crawford County, Inc.,* 467 U.S. 51, 64-65 (1984).

38.     United States Supreme Court Justice Holmes wrote: "Men must turn square corners when they deal with the Government." *Rock Island, A. & L. R. Co. v. United States*, 254 U. S. 141, 254 U. S. 143 (1920).   As the Supreme Court has further noted, this observation has its greatest force when a private party seeks to spend the government's money. Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law.   Health care providers, such as Defendants, can expect no less than to be held to the most demanding standards in their quest for public funds.  This is consistent with the general rule that those who deal with the Government are expected to know the law.  *Heckler v. Commun. Health Svcs.* 467 U.S. 51 (1984).

39.     Medicare Provider Agreements require health care providers to certify to the following:

> 2. I have read and understand the Penalties for Falsifying Information, as printed in this application. I understand that any deliberate omission, misrepresentation, or falsification of any information contained in this application or contained in any communication supplying information to Medicare, or any deliberate alteration of any text on this application form, may be punished by criminal, civil, or administrative penalties including, but not limited to, the denial or revocation of Medicare billing privileges, and/or the imposition of fines, civil damages, and/or imprisonment.
> 3. I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions

are available through the Medicare contractor. **I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.**
\*\*\*
6. I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.
(emphasis added)

40.    Likewise, Medicaid Provider Agreements typically require health care providers to certify:

I understand that any omission, misrepresentation, or falsification of any information contained in this application or contained in any communication supplying information to Medicaid to complete or clarify this application may be punishable by criminal, civil or other administrative actions.
\*\*\*
I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicaid and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

41.    Medicare only pays for Part B services that are actually rendered and are reasonably and medically necessary.  42 U.S.C. § 1395y(a).  Part B providers such as Defendants also must certify that services are medically necessary. 42 C.F.R. § 424.24(g)(1).

42.    State Medicaid claims, which are funded in part with federal dollars, are similarly required to cover only medical items and services that are within the scope of the state program and that are medically necessary. 42 U.S.C. § 1395y(a).

43.    TRICARE also does not pay for services that are not authorized by law or that are fraudulently billed. 32 C.F.R. § 199.7(i)(3).

44.    As participants in federal and state health care programs, Defendants have a duty to familiarize themselves with each health care program's legal requirements and to comply with the False Claims Act.

45.    To obtain reimbursement from all government health care programs, health care providers submit a claim form, which is typically done electronically.

46.    To submit claims electronically, Medicare providers execute an Electronic Data Interchange Enrollment Form ("EDI form"), in which providers agree to "be responsible for Medicare claims submitted to CMS by itself, its employees, or its agents," and to "submit claims that are accurate, complete and truthful."

47.    By executing the EDI Enrollment Form, a provider also acknowledges "that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim as required by this Agreement may, upon conviction be subject to a fine and/or imprisonment under applicable Federal law."

48.    For Medicaid payments, providers also certify on Form CMS 1500 that "services were medically indicated and necessary to the health of this patient." It also contains another "NOTICE" that "the foregoing information is true, accurate and complete … and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws." CMS 1500, Health Insurance Claim Form, https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/CMS-Forms-Items/CMS1188854

49.    To obtain TRICARE reimbursement for services from physicians or other authorized health care providers, as with Medicare, the providers must submit a claim form to TRICARE, which lists the procedure code or narrative description for each procedure or service for each date of service. TRICARE claim forms also must bear a signature of the participating provider certifying that the medical care billed for was actually rendered to the government-

insured patients. This signature certifies that the specific medical care listed on the claim form was actually rendered to the specific government-insured patients at the level indicated on the claim form. 32 C.F.R. §§ 199.7(b)(2)(ix)(B) & (c).

50.    Among the information the provider includes on a CMS 1500 or 837P form are certain five-digit codes, including CPT and Healthcare Common Procedure Coding System ("HCPCS") codes, that identify the diagnosis, services rendered for which reimbursement is sought, and the unique billing identification number of the "rendering provider" and the "referring provider or other source." 45 C.F.R. § 162.1002(a)-(b).  Medicare Claims Processing Manual, Chapter 23, § 20.7 *et seq*. CMS assigns reimbursement amounts to CPT and HCPCS codes.

51.    TRICARE utilizes and incorporates CPT codes to describe the scope of allowable services. TRICARE Policy Manual 6010.60-M, Ch. 1, § 1.1, ¶ 3.4.1.2.

52.    Providing accurate CPT and HCPCS codes on claims submission forms is material to, and a condition of, payment for all government health care programs.

53.    Defendants submitted or caused to be submitted claims for payment to the federal health care programs electronically, upon information and belief, on forms known as a UB-92, HCFA-1450 or UB-04, and CMS-1450, which contain the following certification: "This claim, to the best of my knowledge, is correct and complete []."

54.    Pursuant to all provider agreements between the federal and state governments and Defendants, Defendants must comply with all state and federal regulatory requirements.

III.    THE FRAUDULENT SCHEME

A.    How the Billing Process was Supposed to Work

55.    Evaluation and Management ("E/M") CPT codes are used for in-office or outpatient visits. Billing codes 99201 through 99205 are used for new patient visits while 99211 through 99215 are used for existing and established patients. CPT codes 99201 and 99211 are the starting points and receive the lowest Medicare reimbursement, while each of the subsequent codes denotes an increased level of services provided, and a corresponding greater payment of money from the government.

56.    Health care providers must select the appropriate level of E/M codes to bill based on (1) the level of the Medical Decision Making ("MDM") for each service provided and (2) the total time spent performing E/M services on the date of the visit.

57.    Medical Decision Making encompasses the work of diagnosing patients, assessing the status of a patient's condition, and/or selecting a management option. Medical Decision Making associated with E/M is defined by three elements: (1) "The number and complexity of problem(s) that are addressed during the encounter"; (2) "The amount and/or complexity of data to be reviewed and analyzed"; and (3) "The risk of complications and/or morbidity or mortality of patient management decisions made at the visit, associated with the patient's problem(s), the diagnostic procedure(s), treatment(s)."

58.    There are four Medical Decision Making levels associated with the E/M codes: (1) straightforward, (2) low, (3) moderate, and (4) high. These levels do not apply to the use of code 99211.

59.    Code 99211 can be used when the presenting problems are minimal, and the presence of a physician may not be required.

60.    In contrast, Codes 99201 through 99205 and 99212 through 99215 are only to be used when the treating healthcare provider is a physician, or a physician is present and directly supervising the work of a qualified healthcare professional.

61.    The new patient codes 99201 through 99205 are used when all three "Medical Decision Making" elements are met or exceeded and can be billed as follows:

| CPT Code | Typical Face-to-Face Time (Minutes) | Medical Decision Making (Complexity) | Physician Involvement Required (Y/N) | Medicare Payment 2020 |
|---|---|---|---|---|
| 99201 | 5 | Straightforward | Y | $46.56 |
| 99202 | 10 | Straightforward | Y | $77.23 |
| 99203 | 15 | Low | Y | $109.35 |
| 99204 | 25 | Moderate | Y | $167.10 |
| 99205 | 40 | High | Y | $211.12 |

62.    After January 1, 2021, Medicare eliminated CPT code 99201 and collapsed that service into CPT code 99202, which "requires a medically appropriate history and/or examination and straightforward medical decision making."

63.    The established patient codes [CPT Codes 99212 – 99215] are used when two of three Medical Decision Making elements are met or exceeded and can be billed as follows:

| CPT Code | Typical Face-to-Face Time (Minutes) | Medical Decision Making (Complexity) | Physician Involvement Required (Y/N) | Medicare Reimbursement 2020 |
|---|---|---|---|---|
| 99211 | 5 | N/A | N | $23.07 |
| 99212 | 10 | Straightforward | Y | $6.20 |
| 99213 | 15 | Low | Y | $76.15 |
| 99214 | 25 | Moderate | Y | $110.43 |
| 99215 | 40 | High | Y | $148.33 |

64.    CPT Codes 99212 through 99215 are appropriate only when the treating health care professional is a physician or is being directly supervised by a physician. This requires the physician to have face to face interaction with the patient.

65.    A patient's medical records must demonstrate that the physician performed the reported E/M services as required by CMS Documentation Guidelines.

66.    While a nurse practitioner (NP) or clinical nurse specialist (CNS) can bill for these services, any other non-physician practitioner must work in collaboration and under the supervision of the physician.

67.    The healthcare provider is further responsible to ensure that the code billed reflects the services actually provided to the patient.

68.    CMS announced the following "key takeaways" when providers render and bill E/M services:

•    Clear and concise medical record documentation is critical to providing patients with quality care and is required for you to receive accurate and timely payment for furnished services.

•    While E/M services vary in several ways, such as the nature and amount of physician work required, good general documentation principles help ensure that the medical record documentation for all E/M services is appropriate.

•    When billing for a patient's visit, select codes that best represent the services furnished during the visit.  The provider must also ensure that medical record documentation supports the level of service reported to a payer.  You should not use the volume of documentation to determine which specific level of service to bill.

- To receive payment from Medicare for E/M services, the Medicare benefit for the relevant type of provider must permit him or her to bill for E/M services.

69. CMS further cautions practitioners that the evaluation and management service:

> would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a lower level of service is warranted. The volume of documentation should not be the primary influence upon which a specific level of service is billed. Documentation should support the level of service reported. The service should be documented during, or as soon as practicable after it is provided in order to maintain an accurate record.

*Medicare Claims Processing Manual*, Chapter 12 – Physicians/Nonphysician Practitioners, at Section 30.6.1 (Selection of Level of Evaluation and Management Service)

70. "Upcoding" or billing for services not performed occurs when a code with a higher reimbursement rate is used and does not reflect the true nature of the visit according to AMA and government service guidelines. For example, billing a code that requires physician treatment or direct supervision when the physician was not present, did not treat, and did not directly supervise, is billing the government for services not performed.

71. Knowingly billing the government for services not performed is fraudulent under the False Claims Act.

72. Knowingly making or using a false record or statement material to a false or fraudulent claim is also fraudulent under the False Claims Act.

B. **How the Billing Process Actually Worked**

1. **Services Not Performed**

73. Defendants knowingly billed the government for services that were not performed such as consultations, which include pre-operative services, and post-operative services.

74.    The government reimburses health care providers for dermatology evaluation and management services or consultations, and post-operative services performed by a physician or qualified staff supervised by a physician.  The government always requires that, when staff are performing these high-risk services to patients, they be supervised by a physician.

75.    The government pays more money for these services when performed directly by the physician or supervised qualified staff than it does for the same services performed by qualified staff without physician involvement.

76.    Defendants fraudulently billed the government for consultations and post-operative services.  First, Defendants billed the government at the higher rate paid to physicians even when the services were performed only by staff.  Second, Defendants did not ensure that staff were supervised when they were performing these high-risk services related to Mohs surgeries such as infection control and wound care.  Third, Defendants' unsupervised staff were unqualified and uncertified.

77.    On information and belief, Defendants submitted claims and documents in support of claims to the government under CPT codes 99202-99205 and 99212-99215, which were fraudulent representations to the government that services were performed by physicians or under the direct supervision of physicians.

78.     In fact, it was non-physician staff that performed the services, including consultations and post-operative services, and without the direct supervision of a physician.

79.    Because CPT codes 99202-99205 and 99212-99215 are for physician-provided or supervised services, these are reimbursed by the government at a higher rate than CPT Code 99211, which is the allowable billing code for services performed by unsupervised but qualified and certified staff.

80.     Medicare would not have reimbursed these services under these higher-paid CPT codes had it known that the services were not performed by a physician or under the direct supervision of a physician.

81.     The government requires a physician to consult with patients before most Mohs surgeries and for all post-operative services.

82.     During a post-operative follow-up visit, the physician who performed the Mohs surgery must evaluate and excise the tumor site (also known as the lesion) of the patient to include the removal of sutures, staples, or stitches and treat infections or address complications.

83.     Yet, Defendants improperly allowed unqualified and uncertified staff to perform these post-operative services and avoided detection by billing the government at higher amounts under CPT Codes 99212-99215, as if a physician had performed or supervised the services.

84.     Non-physician staff did not have the proper clinical credentials or training to perform consultation or post-operative services without at least the direct supervision of a physician.

85.     PhyNet did not employ a nurse practitioner (NP) or clinical nurse specialist (CNS), the only qualified individuals other than a physician to perform the services and bill the government without direct physician supervision.

86.     NPs are required to obtain a master's degree and years of training and experience and to pass a national certification exam.  CNS staff are also required to obtain a graduate degree, years of training and experience, and licensure as a registered nurse.

87.     Dr. Christine Kannler is a certified Mohs Micrographic Surgeon who has practiced in at least four NEDA locations: (1) Bedford, New Hampshire; (2) Manchester, New Hampshire; (3) Beverly, Massachusetts; and (4) North Andover, Massachusetts.

88.     Dr. Kannler has been responsible for patients at these NEDA locations four days per week: Mondays and Tuesdays at North Andover, Massachusetts; Wednesdays at Manchester, New Hampshire; and Thursdays at Beverly, Massachusetts.  Beginning in April 2019, Dr. Kannler was responsible for patients at NEDA's Bedford, New Hampshire location on Fridays.

89.     Upon information and belief, Dr. Kannler has typically worked with a team of three to five medical staff, including a nurse and uncertified dermatology technicians, who travel to work with her at each location and work on the same daily schedule as Dr. Kannler.

90.     PhyNet staffed Dr. Kannler's team with only one Licensed Professional Nurse (LPN), medical assistants, and histotechs.

91.     LPNs are required to have only a vocational degree and months, not years, of training.

92.     Medical assistants are only required to have graduated high school and obtain an accredited certification.

93.     Histotechs are laboratory staff who take and process lab specimens.  A Mohs histotech is required to be certified by CLIA high complexity testing personnel standards.

94.     Histotechs, LPNs, and medical assistants are not required to have specific training in the evaluation, consultations, or post-operative dermatology services that PhyNet primarily performed and billed to the government.  As a result, Defendants were employing staff without appropriate qualifications, yet were allowing them to perform specialized services on patients, which put patients' health and safety at risk.

95.     At most, Dr. Kannler's staff had on-the-job and online dermatology training. None of the online training was specific to the services and procedures for specialized Mohs surgeries.

96.     However, all Dr. Kannler's unqualified and uncertified staff performed consultations, including for serious dermatological conditions, and post-operative services such as the removal of stitches, sutures, and staples and wound care without any physician supervision.

97.     Unqualified and uncertified staff provided medical opinions often with nothing more than a physician's electronic review on an iPad of a melanoma during a consultation or a lesion during a post-operative surgical visit.  At times, even a physician's electronic review of a melanoma or lesion was not performed.

98.     Lesions that required additional treatment or were infected were also diagnosed and treated by unqualified and uncertified staff.

99.     At times, services were improperly performed and unsupervised by unqualified and uncertified staff when Dr. Kannler was on site but unavailable.  At other times, these services were performed when Dr. Kannler was not on duty and off-site.

100.    PhyNet subjected unqualified and uncertified staff to a "trial by fire" and pressured them to provide services they knew they were not qualified to perform.

101.    Services under CPT codes 17312-17315 were performed and billed to the government even during times when Dr. Kannler was off duty and out of the office.

102.    Non-physician staff were scheduled to see patients for consultations and post-operative services on days when Dr. Kannler was scheduled to be off-duty, including on vacation, and was, in fact off-duty.

103.    For example, Dr. Kannler had scheduled time off on at least the following dates: April 4, 2019, May 2, 2019, May 3, 2019. During these times, non-physician staff were

scheduled to (and did) perform consultations and post-operative services and billed the government for these services under CPT codes 99212-99215.

104.    Non-physician staff were also scheduled to see patients for consultations and post-operative services on dates when Dr. Kannler was scheduled to leave the office early.

105.    Further, at the end of Dr. Kannler's normal day of work, non-physician staff routinely remained in the office until between 5PM and 6PM to perform patient consultations, post-operative services and to input important information in the patient medical records.

106.    For example, Dr. Kannler was scheduled to leave the office early on May 8, 2019. Dr. Kannler left the office through a back door at 12:30PM and her LPN left around 12:30PM.

107.    Yet, consultations and post-operative services were scheduled and performed when Dr. Kannler was off-duty and out of the office.

108.    Non-physician staff performed wound care and stitch removals and billed the government under CPT Codes 99212-99215.

109.    On May 8, an attempt was made to contact Dr. Kannler and the only nurse on her team when an unqualified individual on her staff was concerned that they were treating a patient with an Unna boot device, a compression device administered when a patient is suffering from edema – blood and fluid pooling in the lower extremities.

110.    Staff received "no reply or answer from either of them," for almost 30 minutes and PhyNet was notified of the inability to reach qualified staff with an email at 3:30PM.

111.    More than 30 minutes later, PhyNet directed the employee to reschedule the patient for later in the week despite concerns expressed by staff that it was unsafe for a patient to wear an Unna boot device for a lengthy period of time.

112.    The employee objected to billing for the patient under CPT Codes 99212-99215 because Dr. Kannler was unavailable.  In this one instance, because of the direct objection, PhyNet leadership allowed the service to be billed under CPT Code 99211.  In this instance, PhyNet has Grimard as the provider and Dr. Kannler as the biller.

113.    On information and belief, Dr. Kannler routinely had commitments outside the office during entire days or part of days when unqualified and uncertified staff performed consultations and post-operative services, while fraudulently billing the government under CPT codes 99212-9915.

**2.      Knowledge of Fraudulent Billing (Scienter)**

114.    Defendants knowingly billed the government for services related to the Mohs surgeries.  First, Defendants knowingly billed the government at the higher rate paid to physicians even when the services were performed only by staff.  Second, Defendants knowingly did not ensure that staff were supervised by a physician when they were performing high-risk services such as infection control and wound care.  Third, Defendants knowingly used unqualified and uncertified staff who were not supervised by a physician.

115.    Defendants have represented themselves to the public on their website as knowledgeable of government regulations and compliance:

- "PhyNet Navigates the Complex World of Healthcare Regulations to Ensure Affiliate Compliance"
- "PhyNet's deep knowledge of dermatology regulatory compliance hinges on knowing which federal and state regulations apply to your specific practice, ensuring those regulations are being followed correctly, and tracking any changes to laws year to year."
- "PhyNet's network of affiliates and business professionals offer more experience, understanding of regulations, and oversight than any one person could. . ."

116.    This stands to reason because Defendants are responsible to be knowledgeable about the regulatory environment in which it operates and is paid federal taxpayer funds from the Medicare, Medicaid and TRICARE programs.

117.    Dr. Kannler typically scheduled 4 to 8 Mohs surgeries daily. If a Mohs surgery was cancelled, Dr. Kannler's team was pressured to fill it with another Mohs surgery to avoid any corresponding loss in income.

118.    On April 25, 2019, one employee reported "compliance issues" to PhyNet Human Resources and Benefits Specialist, including observations that Dr. Kannler was so overbooked with Mohs surgeries that she was not participating in consultations or post-operative services, yet was billing the government under CPT Codes 99212-99215.

119.    On May 8, 2019, Grimard reported to PhyNet's Regional Director of Operations that Dr. Kannler improperly left the office, requiring non-physician staff to perform consultations and post-operative services, placing the patients in the care of unqualified and uncertified staff who themselves recognized they were not properly trained.

120.    During that same communication, Grimard further reported that Defendants improperly billed the government for these services under CPT Codes 99212-99215, and that statements were made in at least one patient's medical records to falsely represent that the patient was treated by Dr. Kannler.  The PhyNet Regional Director instructed Grimard to email these concerns to PhyNet Clinical Quality and Training Director.

121.    Accordingly, Grimard followed up with PhyNet Regional Director of Operations, PhyNet Clinical Quality and Training Director, and PhyNet Billing Administrator and Regional Practice Manager reiterating concerns about an unqualified staff person left alone to see patients

for consultations and post-operative services for over two hours.  Grimard expressed concerns

over patient safety and improper billing as direct services performed by a physician.

122.    In only this one instance, PhyNet instructed Grimard:

> In the meantime please put yourself as the provider, Dr. Kannler as biller (but not
> in attendance) on any notes you saw alone so the note accurately reflects who saw
> the patient. I'm sorry you were put in this position.

123.    PhyNet leadership represented that these issues "will be addressed by the

directors tomorrow" but the business practices alleged in this Complaint were not changed.

124.    On May 16, Grimard reiterated to PhyNet leadership that these concerns were the

result of broader and recurrent practices:

> It was my concern that we were seeing patients with no provider on site which
> didn't seem right to me patient care wise.  It also didn't sit well with me that we
> were char[g]ing [sic] for Dr. Kannler being the provider and biller.  When I brought
> that piece up, the charges were changed from Dr. Kannler being the provider to me
> being the provider and her being the biller.  **<u>I expressed that this happens often.</u>**
> We saw patients with no provider on site as well as charge patients for a provider
> being on site and we also see consults while she is not here which again is I believe
> charged as such.
> (emphasis added)

## IV.    MATERIALITY

125.    Defendants knew that compliance with Medicare billing rules was material to the

government's decision to pay claims for Mohs surgeries and related services, including

consultations and post-operative services.  Defendants also knew that truthful records and

statements in support of claims for dermatology services were material to the government's

decision to pay these claims.

126.    Defendants also knew that submitting claims only for properly rendered Mohs

surgeries and related services, including consultations and post-operative services was material

to the government's decision to pay claims. Defendants also knew that truthful records and

statements in support of claims for Mohs surgeries and related services, including consultations and post-operative services, were material to the government's decision to pay these claims.

127.    Some of the factors in evaluating materiality under the False Claims Act include (a) statutory, regulatory, and contractual language, (b) whether the violations go to the heart of the benefit of the bargain, (c) whether the violations were serious and material and not merely technical or minor infractions of rules, (d) the government's actions relative to similar violations, (e) whether any reasonable person would attach importance to Defendants' choice of actions, and (f) Defendants' knowledge relative to these factors.  All these factors demonstrate materiality in this case and have been addressed throughout this Complaint.

128.    Defendants knowingly submitted or caused to be submitted false or fraudulent claims and used false records and statements in support of false or fraudulent claims for Mohs surgeries and related services, including consultations and post-operative services.

129.    The United States Department of Justice in partnership with the United States Department of Health and Human Services, Office of Inspector General (HHS-OIG) has enforced the False Claims Act in other instances of similar conduct involving evaluation and management services, as alleged in this Complaint.

130.    For example, in 2019, the United States Attorney's Office for the District of Massachusetts recovered $2 Million in losses to Medicare and Medicaid from owners and operators of urgent care centers located throughout Massachusetts and Rhode Island to resolve allegations that they violated the False Claims Act by submitting "inflated and upcoded claims" for evaluation and management (E/M) services that were performed by a nurse practitioner, without the direct supervision of a physician. https://www.justice.gov/usao-ma/pr/carewell-urgent-care-center-agrees-pay-2-million-resolve-allegations-false-billing

131.    The facts alleged in the Complaint show that Defendants were well-aware of the statutory and regulatory requirements for submitting claims for Mohs surgeries and related services, including consultations and post-operative services, and that the Defendants knew that the violations alleged in this Complaint were material to the government's decision to pay.  CMS expects and requires that claims be paid only for accurate and truthful claims.

132.    CMS's statutory and programmatic requirements for complete, accurate, and truthful reporting during the claims-submission process and its insistence that claims be based on services properly rendered goes directly to the "essence of the bargain." These requirements are neither "minor nor insubstantial."

133.    Defendants' violations of the statutory, regulatory, and programmatic requirements were serious and material, leading to actual or potential harm, and were made with at least reckless disregard of the seriousness of their violations.

134.    Defendants' violations were not immaterial or inadvertent technical mistakes in processing paperwork, or simple and honest misunderstanding of the rules, terms and conditions, or certification requirements. Rather, Defendants knowingly failed to comply with material legal obligations and certifications.

135.    Defendants knew that they were submitting or causing to submit false or fraudulent claims for Mohs surgeries and related services, including consultations and post-operative services, including false or fraudulent statements, records, and claims for government health care funds, which the government paid to Defendants.

136.    In short, there is ample evidence to demonstrate that Defendants knew or should have known that their violations had the natural tendency to influence the government's decision to pay the claims for Mohs surgeries and related services, including consultations and post-

operative services, and that any reasonable person would attach importance to the Defendants' choice of action.

## V.    UNLAWFUL RETALIATION

137.    Grimard became employed by Defendants on March 4, 2019, as a Mohs histotech and medical assistant.

138.    Grimard repeatedly and consistently informed management of concerns related directly to the allegations set forth in the Complaint.  Grimard was troubled that Defendants were engaged in unlawful practices alleged in the Complaint.  Grimard also feared job security and the legal propriety of Defendants' actions.

139.    Yet, Grimard was reprimanded and retaliated against by Defendants when raising concerns related to, and objecting to, Defendants' fraudulent course of conduct alleged in this Complaint.

140.    As a result of the unlawful retaliation alleged in this Complaint, Grimard was constructively discharged on May 15, 2019, and Grimard's employment with Defendants ended as of that date:

> I want to thank you all for the opportunity to work for NEDA and with Dr. Kannler.  I am sorry things did not go as well as we had all hoped, but I truly feel there are bigger issues with this team and I am sorry it seems that peoples discontent with me happened only after these issues and concerns were voiced to corporate and upper management.  Today is my last day with NEDA and again thank you for the opportunity.

141.    Earlier, on April 25, 2019, Grimard had reported "compliance issues" to PhyNet Human Resources and Benefits Specialist, including observations that Dr. Kannler was so overbooked with Mohs surgeries that she was not participating in consultations or post-operative services, yet was billing the government under CPT Codes 99212-99215.

142.    Five days later, on April 30, 2019, Grimard participated in a conference call with PhyNet Human Resources and Benefits Specialist and PhyNet's Regional Director of Operations to continue discussion of the "compliance issues" raised earlier, including concerns that consultations and post-operative services were not being properly supervised or billed. At that meeting, PhyNet leadership agreed that these were serious issues that needed remediation.

143.    On May 8, 2019, Grimard reported to PhyNet's Regional Director of Operations that Dr. Kannler improperly left the office, requiring non-physician staff to perform consultations and post-operative services, placing the patients in the care of unqualified staff who themselves recognized they were not properly trained.

144.    During that same communication, Grimard further reported that Defendants improperly billed the government for these services under CPT Codes 99212-99215, and that statements were made in at least one patient's medical records to falsely represent that the patient was treated by Dr. Kannler.

145.    The PhyNet Regional Director instructed Grimard to email these concerns to PhyNet Clinical Quality and Training Director.

146.    Accordingly, Grimard followed up with PhyNet Regional Director of Operations, PhyNet Clinical Quality and Training Director, and PhyNet Billing Administrator and Regional Practice Manager reiterating concerns that Grimard was left alone to see patients for consultations and post-operative services for over two hours. Grimard expressed concerns over patient safety and improper billing as direct services performed by a physician.

147.    In only this one instance, PhyNet instructed Grimard to correct the improper billing:

> In the meantime please put yourself as the provider, Dr. Kannler as biller (but not in attendance) on any notes you saw alone so the note accurately reflects who saw

the patient. I'm sorry you were put in this position. It will be addressed with Dr. Kannler.

148.    PhyNet leadership represented that these issues "will be addressed by the directors tomorrow" but the business practices alleged in this Complaint were not changed.

149.    Grimard's reported concerns regarding the practices at the Defendants' Manchester office were protected reports for purposes of the False Claims Act and the New Hampshire Whistleblowers' Protection Act.

150.    Grimard reported what she, in good faith, reasonably believed to constitute practices that were defrauding the government, violating the law, and endangering patients.

151.    Grimard reported these practices to shed light on them and in hopes that by reporting these practices that they would be addressed and eliminated. As a result of Grimard raising the concerns alleged in this Complaint, Defendants attempted to retaliate against Grimard by expressing "discontent" with Grimard's job performance for the first time in Grimard's employment on May 9.

152.    More particularly, Dr. Kannler's discontent with Grimard's performance was voiced for the first time on the very day after Grimard's May 8 report to PhyNet leadership the concerns about patient safety, patient care and the billing problems alleged in this Complaint, some of which Grimard had previously raised about two to three weeks prior with PhyNet Human Resources and Benefits Specialist.

153.    On May 15, 2019, PhyNet Regional Director of Operations and PhyNet Billing Administrator and Regional Practice Manager had a conference call with Grimard.  During this call, they said that Grimard was not a "good fit" for Dr. Kannler's team and that, if Grimard wanted to remain employed by Defendants, Grimard would have to transfer to a different job.

154.   Defendants' stated reason for the involuntary modification of Grimard's job was false and pretextual.

155.   Grimard was an excellent employee who performed her job well.

156.   Prior to May 15, 2019, Grimard was never told that her performance was problematic in any way.

157.   PhyNet Regional Director of Operations and PhyNet Billing Administrator and Regional Practice Manager told Grimard that if Grimard took this new job, Grimard would be given a different job title, would not receive any training to be a Mohs Technician, and would be allowed to perform only Medical Assistant work.

158.   PhyNet Regional Director of Operations and PhyNet Billing Administrator and Regional Practice Manager further informed Grimard that this new reassigned job would require Grimard to commute to Beverly, Massachusetts, every day.  Up until that point, Grimard had worked in Beverly one day per week; in Manchester, New Hampshire, one day per week; in Bedford, New Hampshire, one day per week; and in North Andover, Massachusetts, two days per week.  Grimard lived in Manchester, New Hampshire, and it took Grimard about two and a half to three hours per day to commute to and from the Beverly office; about 30 minutes per day to commute to and from the Manchester office; about 20 minutes per day to commute to and from the Bedford office; and about 80 minutes per day to commute to and from the North Andover office.  Thus, moving to a job where Grimard worked in Beverly every day of the week would have increased Grimard's commute time by over eight hours per week.

159.   Grimard had accepted the job offer from Defendants to gain more experience and training as a Mohs Technician and to reduce the commute time for her prior job which was in Cambridge, MA.

160.    Mohs Technicians have the ability to earn more money than Medical Assistants. This new job that Defendants told Grimard that Grimard would have to take to remain employed did not have that same benefit.

161.    The commute to Beverly would be the same or worse than the commute to Cambridge, MA for Grimard's prior job.

162.    Grimard took a pay cut to take the position with Defendants and reduce her commute and her employer knew as much.

163.    Defendants modified Grimard's job to create the longer commute because Defendants knew that working closer to home was one of the most important aspects of her job with Defendants and knew that this would likely cause Grimard to resign.

164.    But for the concerns Grimard expressed about the conduct alleged in this Complaint, Defendants would not have removed Grimard from the Manchester office and assigned her to work full time at the Beverly office.  Before Grimard reported these unsafe and fraudulent activities, there was no indication that Grimard's job was in jeopardy or that Grimard was not a "good fit."

165.    When Defendants informed Grimard that Grimard would have to switch to a job that was not as specialized and with a longer commute to remain employed, they were trying to force Grimard to quit, and it worked.

166.    Defendants' decision to require Grimard to change jobs constituted a constructive discharge.  Grimard's employment with Defendants ended on May 15, 2019, due to this constructive discharge.

167.    The following day, Grimard reiterated these previously raised concerns directly to PhyNet leadership:

31

I went to [PhyNet Management] about some concerns I felt were major patiently [sic] safety issues, billing issues, and possible fraud with coding . . . I feel there [sic] were minimized and brushed off.  I never got straight answers if a provider needed to be on site for us to see patients. . . .We (me CDT [Certified Dermatology Technician] and an MA [medical assistant]) saw patients until 3-3:30PM for wound care follow ups and stitch removals.  It was my concern that we were seeing patients with no provider on site which didn't seem right to me patient care wise.  It also didn't sit well with me that we were charging for Dr. Kannler being the provider and biller.  When I brough that piece up, the charges were changed from Dr. Kannler being the provider to me being the provider and her being the biller.  I expressed that this happens often.  We saw patients with no provider on site as well as charge patients for a provider being on site and we also see consults while she is not here which again is I believe charged as such.  There is a list of things I was not comfortable, and I voiced them in a phone conference with Julie O'Leary and Regina 2-3 weeks ago now.

168.    On May 17, 2019, PhyNet followed up with Grimard stating:

Thank you for bringing forth the concern you have for certain practices at our Manchester, NH location.  PhyNet Dermatology acknowledges your concerns and will conduct a thorough investigation to ensure we (the Company) are conducting business ethically and in the best interest of our employees and patients. It is our understanding that you voluntarily resigned from PhyNet Dermatology on May 15, 2019.  Should we need additional information regarding the concerns you have raised we will reach out to you. We wish you luck.

169.    Defendants responded to separate concerns that had earlier gone unanswered after

Grimard was constructively discharged and Grimard again reiterated the allegations raised in this

Complaint:

Thank you for reaching out about my OSHA [The Occupational Safety and Health Administration] concerns. I have given a list and explanation below. However, I want to be very clear that during our phone call last Thursday 5/16, my main concerns and reason for our phone call were retaliation against me and the unjust conclusion that came from me pointing out or **being a "whistle blower" with medical billing/coding and patient care the week prior 5/8 specifically**. (emphasis added)

170.    On information and belief, other employees of Defendants also raised internally

the same concerns alleged by Grimard in this Complaint, and their concerns were also

disregarded and they, too, were forced out and constructively discharged.

171.    As a result of Defendants' retaliatory actions and constructive discharge, Grimard has sustained economic harm in the form of lost wages and benefits and has caused Grimard significant emotional distress and led to heightened stress and anxiety levels and sleeplessness over Grimard's concerns about the serious potential for patient harm and harm to Grimard's career should Grimard be asked by a future employer about the reason for Grimard's short tenure while employed by Defendants.

172.    As a direct and proximate result of Defendants' unlawful retaliation against Grimard, Grimard has suffered damages including, but not limited to, lost income and loss of enjoyment of life.

173.    Defendants justified the unlawful transfer of Grimard away from the Manchester office in part based on the claim that Grimard was not a "good fit" for Dr. Kannler's team.  This is an admission and direct evidence that Grimard was unlawfully retaliated against for raising concerns about the unlawful and fraudulent practices of Dr. Kannler's team.

174.    Defendants' stated reasons for transferring and otherwise changing Grimard's position are pretexts which were offered in an effort to dissemble Defendants' retaliatory purpose.

175.    The probative timing of Grimard's protected reports and the adverse employment actions evidence a causal connection.

176.    Defendants had motive to retaliate against Grimard an exhibited animus towards her in connection with her protected activity.

177.    Defendants retaliated against Grimard because of lawful acts by Grimard to stop one or more violations of the False Claims Act and lawful acts by Grimard in furtherance of an action under 31 U.S.C. § 3730.

178.    For the reasons set forth in this Complaint, Grimard is entitled to back pay, double the amount of back pay, interest on the back pay and compensation for any special damages sustained as a result of the retaliation, including litigation costs and reasonable attorneys' fees, and all other remedies and recompense allowable under 31 U.S.C. § 3730(h) and State retaliation provisions alleged in this Complaint, including but not limited to compensatory and enhanced damages to compensate Grimard for the non-monetary harms and losses caused by Defendants' unlawful retaliation.

## VI.    COUNTS

### COUNT I
### Retaliation in Violation of False Claims Act
### 31 U.S.C. § 3730(h)

179.    The allegations in paragraphs 1-178 are incorporated by reference.

180.    Grimard engaged in lawful acts in furtherance of efforts to stop one or more violations of 31 U.S.C. § 3729.

181.    Because of Grimard's lawful acts, Grimard was subjected to retaliation by Defendants.

182.    Grimard was unlawfully retaliated against by Defendants for engaging in protected activity, namely for raising, objecting to and refusing to participate in fraudulent conduct alleged in this Complaint.

183.    Defendants' retaliation against Grimard was a violation of 31 U.S.C. § 3730(h).

184.    Because of Defendants' violations of 31 U.S.C. § 3730(h), Grimard suffered damages.

185.    Grimard is entitled to damages sustained because of the retaliation, including litigation costs and reasonable attorneys' fees, and all other remedies and recompense allowable under 31 U.S.C. § 3729(h).

**COUNT II**
**Retaliation in Violation of the New Hampshire Whistleblower Protection Act**
**N.H. Rev. Stat. § 275-E:2**

186.    The allegations in paragraphs 1-185 are incorporated by reference.

187.    During, and by virtue of Grimard's employment with Defendants, Grimard obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint and in good faith reported, or caused to be reported Defendants' violations.

188.    Defendants, with actual knowledge of Grimard's lawful acts and other efforts to stop Defendants' violations of state and federal law, unlawfully retaliated against Grimard.

189.    As a direct and proximate result of Defendants' retaliatory actions, Grimard suffered damages and is entitled to all allowable relief under N.H. Rev. Stat. § 275-E:2, including back pay and reasonable attorneys' fees.

**COUNT III**
**Wrongful Termination**
**Violation of New Hampshire Law**

190.    The allegations in paragraphs 1-189 are incorporated by reference.

191.    Defendants constructively discharged Grimard in violation of public policy because Grimard took actions that public policy would encourage, namely, for reporting concerns of unlawful, unsafe, and fraudulent activities.  *Cloutier v. Great Atlantic & Pac. Tea Co., Inc.*, 121 N.H. 915 (1981).

192.    Defendants' constructive discharge of Grimard was motivated by bad faith, retaliation, and malice. *Wenners v. Great State Beverages*, 140 N.H. 100, 103 (1995) cert. denied, 516 U.S. 1119 (1996).

**WHEREFORE**, Grimard, prays:

(a) That she receive all relief necessary to make her whole for Defendants' violations of 31 U.S.C. § 3730(h);

(b) That the Court order Defendants to award Grimard back pay;

(c) That the Court order Defendants to award Grimard front pay in lieu of reinstatement;

(d) That she receive an award of liquidated damages equal to her back pay, including the value of lost benefits;

(e) That she receive an award of compensatory damages and enhanced compensatory damages in an amount to be proven at trial for the economic, reputational, and emotional harm Grimard experienced as a result of Defendants' unlawful conduct;

(f) That judgment be entered against Defendants jointly and severally, in amounts to be determined at trial;

(g) That she be awarded all costs and expenses incurred, including reasonable attorneys' fees; and

(h) That the Court order such other relief as is appropriate.


Dated: April 1, 2024                    Respectfully submitted,

                                        /s/ Chad T. Hansen
                                        Chad T. Hansen, NH Bar No. 269340

/s/ Martin P. Tartre
Martin P. Tartre, NH Bar No. 276469

Attorneys for the Plaintiff
EMPLOYEE RIGHTS GROUP
92 Exchange Street 2nd floor
Portland, Maine 04101
Tel. (207) 874-0905
Fax (207) 874-0343
Chad@EmployeeRightsLaw.Attorney
Martin@EmployeeRightsLaw.Attorney

CERTIFICATE OF SERVICE

I certify that I served the foregoing document upon all counsel via the Court's ECF system.

Dated:  April 1, 2024                    /s/ Chad T. Hansen
                                         Chad T. Hansen